IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANNE BUCKINGHAM, | § | |
| PLAINTIFF | § | C.A. No. 4:13-cv-0392 |
| | § | |
| vs. | § | |
| | § | |
| BOOZ ALLEN HAMILTON, INC. | § | JURY TRIAL DEMANDED |
| DEFENDANT | § | |

**PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING LIABILITY**

Plaintiff Anne Buckingham now moves for partial summary judgment regarding liability in this Title VII action. In support she states as follows.

## NATURE AND STAGE OF THE PROCEEDING

This is a Title VII gender discrimination case. Plaintiff's motion to compel certain discovery is pending with the Court, as is a separate motion for judgment on the pleadings and/or for partial summary judgment regarding certain affirmative defenses. Docket Entry Nos. 23 and 24. The discovery period ended on August 1, 2014. Docket Entry No. 19. The motions cutoff is September 1, 2014. *Id.* Plaintiff now moves for partial summary judgment regarding liability.

## ISSUE PRESENTED

Employers violate Title VII when gender motivates an employment decision, even if there are other reasons. Matthew Tom chose Ben Hayhurst over Anne Buckingham to remain employed because (i) she had five children at home and he therefore assumed she would not be interested in the job's allegedly-required travel, and (ii) he thought she was just interested in "being a mom right now." These views perpetuate age-old discriminatory attitudes about women with small children, and Tom agrees that denying someone work on the assumption that she just wants to be a mom reflects gender bias. Because Tom made discriminatory assumptions when deciding which employee to retain, should summary judgment on liability be entered for Plaintiff because it is undisputed that her gender was a motivating factor in Tom's decision?

FACTS

Anne Buckingham, a former CIA analyst, worked for Booz Allen Hamilton ("BAH" or "Booz Allen"), a federal contractor, for approximately eleven years. Exhibit 1, Declaration of Anne Buckingham ("Buckingham Dec."), ¶ 2. In her last assignment, BAH assigned Buckingham to work at the United States Department of Homeland Security ("DHS" or "Homeland Security") as a Reports Officer. *Id.* at ¶ 3. Booz Allen filled these positions pursuant to a contract with Homeland Security. Exhibit 2, Deposition of David Rubin ("Rubin Depo."), p. 15-16. As a Reports Officer, Buckingham served as an intelligence liaison between DHS and various governmental agencies located in southeast Texas. Buckingham Dec., ¶ 3. She was based in Houston, Texas, and worked for BAH out of a home office. *Id.*

BAH had two employees – Anne Buckingham and Ben Hayhurst – assigned to DHS as Reports Officers. Buckingham Dec., ¶ 4; Exhibit 3, Deposition of Ben Hayhurst ("Hayhurst Depo."), p. 33-34. Buckingham and Hayhurst each reported to Matthew Tom. *See* Buckingham Dec., ¶ 6; Hayhurst Depo., p. 18-19, 21-22. BAH provided other Reports Officers to DHS, but only through subcontractors. Buckingham Dec., ¶ 4; Hayhurst Depo., p. 13-15. Whether the personnel were direct BAH employees or employed by BAH subcontractors, the government paid BAH a rate based on the role the personnel played under BAH's government contract. Rubin Depo., p. 38-39. Though Buckingham was senior to Hayhurst within BAH, they both performed precisely the same job for DHS (albeit in different geographic locations). Buckingham Dec., ¶ 4; Exhibit 4, Deposition of Matthew Tom ("Tom Depo."), p. 16-17. Matthew Tom concedes that Buckingham was clearly better qualified than Hayhurst to perform that job. *Id.* at 17-18. Hayhurst agrees. Hayhurst Depo., p. 39.

The federal contract Buckingham and Hayhurst worked on came to an end in early 2011. Buckingham Dec., ¶ 5.  As a result, she and Hayhurst were issued Lack of Work (or LOW) notices. Hayhurst Depo., p. 25-26; Exhibit 5 (Hayhurst LOW Notice); Exhibit 6 (Buckingham LOW Notice).  These notices informed them that their employment would be terminated if they did not find other BAH work before their notification pay ran out.  In Buckingham's case, this meant that her employment would terminate on February 25, 2011.  Exhibit 6.  Because Hayhurst was junior to Buckingham his notification pay was scheduled to run out one week earlier, on February 18, 2011.  Exhibit 5.

Hayhurst was looking for alternative employment when, at the last minute, he was told there was some funding available and Booz Allen wanted to put him back on the DHS contract. Hayhurst Depo., p. 25 and 30.  Hayhurst then had a phone conversation with Matthew Tom, who called to talk about the procedure for getting Hayhurst's badge back.  *Id.* at 33.  Tom has no memory or independent recollection of any discussion with Hayhurst, including about whether the position had first been offered to Buckingham.  Tom Depo., p. 9-10.[1]

Hayhurst does remember the conversation, though, and he specifically asked whether the position had been offered to Buckingham.  Hayhurst Depo., p. 33-34.  Tom responded that because the position supposedly would involve a substantial amount of travel, he did not think Buckingham would be interested.  *Id.* at 34.  Hayhurst further explained:

> And the two phrases or two wording that – that stick out in my mind is he said something to the effect of I think **she's just kind of going to focus on being a mom right now, or just is interested in being a mom right now.  And then he made a comment to the effect of, you know, she has a lot of kids, and traveling like this would probably be very difficult for her, so, you know, I think it's probably just not a good fit for her.**  Something to that effect.

---

[1]The position was never offered to Buckingham.  Buckingham Dec., ¶ 6.

*Id.* at 34-35 (emphasis added). Tom offered Hayhurst no other explanation for Hayhurst's

selection over Buckingham. *Id.* at 46-47. In a subsequent email to his boss, Noah Spivak, Tom

offered a different excuse not mentioned to Hayhurst, but confirmed that "she will probably not

be able to accommodate 3-4 weeks of travel at a time, **but that is an assumption**." Exhibit 7

(emphasis added). Tom admits that he made this assumption because of Buckingham's family

responsibilities and her five children at home. Tom Depo., p. 7-8 and 56. Spivak noted in response

to Tom's email that it was this "assumption that gets us in trouble" and that "HR is already

scrambling." Exhibit 7.

Despite not remembering the conversation, Tom readily recognizes that such assumptions

constitute sex discrimination:

> Q. Okay. Would you agree, Mr. Tom, that it would be inappropriate for you to make a decision about whether to retain or not retain an employee based upon whether they're just happy being a mom?
> A. Would I agree with that?
> Q. Yeah. Is that inappropriate?
> A. That is.
> Q. Why?
> A. You know, I think – well, in what context, I guess?
> * * *
> Q. So, for example, if you were having to choose between two employees, a man and a woman, who to keep and who to retain and you thought, you know what, I think my female employee would probably just be happy staying at home and being a mom and so that's going to factor into my decision to keep the guy, that's the context. So why would – why would that be inappropriate in that context? . . . If you think – if you think it would be.
> A. Well, assuming that there's no other previous discussions with the female employee, I think it's inappropriate because you're making a decision based off of, you know, something that wasn't discussed with the employee here, you know, just assuming they don't want to have a job or stay at home or whatever the words you used, stay at home and be a mom.
> Q. Right. **It's – it's just kind of prejudiced to think that women just want to stay home with their children and so that's a good thing for them; right?**
> A. **Right.**
> Q. **You would agree with me that to say something like that would be some indication of gender bias?**
> A. **Yes.**

* * *

Q.      If – if you were – if you made a statement that a female employee would probably just be happy staying at home being a mom, you would agree that that would not be an EEO friendly thing to say.

A.      If it's tied to the decision on whether to give her a job or not, yes.

Tom Depo., p. 117-119 (emphasis added) (form objections omitted).

Booz Allen also knows that these considerations were inappropriate, and has actually given its personnel specific training about their impropriety:

Q.      You would agree with me, wouldn't you, Mr. Spivak, that it would be inappropriate to make a personnel decision based upon a manager's assumption that some woman would rather be home with her kids, just being a mom rather than gainfully employed in the workplace? That's inappropriate, isn't it?

A.      It's not an appropriate question. It is – it's not what happened in – in this case.
        MS. HEADLEY: It's a question he can ask and you can answer.
        THE WITNESS: Okay.

Q.      It's not an inappropriate question – it's not an appropriate question?

A.      I would have concerns to hear that personnel decisions were made based on assumptions about whether someone wanted to stay home and be a mom.

Q.      **Why would you have such concerns?**

A.      **It's a circumstance that was flagged in training that I've received from Booz Allen.** I think I'll stop there.

* * *

Q.      And what was it that you gleaned from **this Booz Allen Hamilton provided training** that makes you think that a personnel action based on assuming someone just wants to stay home and be a mom would be inappropriate?

A.      I think it could give the misperception of someone treating people unfairly based on family status or something like that.

* * *

Q.      What kind of training was this?

A.      Recruiting. Possibly EEOC.

Q.      So this was training about how to make sure you're in compliance with the laws that prohibit discrimination on the basis of things like gender.

A.      I don't know if it was that as much as being aware what the rules were and knowing when to involve human resources and legal who are experts in – in that.

Q.      And – and so the EEOC training that you received from Booz Allen taught you that you shouldn't be making personnel decisions based on assumptions that a woman with kids is just going to be happy staying home with her kids.

A.      I – I don't know that it addressed that specific scenario.

Q.      But – but you gleaned that from the training; that it would be inappropriate to make such an assumption about a woman with children.

A.      To the best of my recollection, yes.

Exhibit 8, Deposition of Noah Spivak ("Spivak Depo."), p. 124-127 (emphasis added).[2]

Three additional facts bear mentioning. First, Buckingham had never outright refused to travel during her long employment with Booz Allen, except for one occasion when some January 2010 meetings in the Washington, D.C. area conflicted with her running of the Houston Marathon and a family commitment in the middle of the following week. Buckingham Dec., ¶ 7. As a result, Buckingham was able to make it to the east coast for only a portion of those meetings. *Id.* By contrast, and to Matt Tom's annoyance, Ben Hayhurst outright refused to travel for any portion of that same meeting because he had two small children at home. Exhibit 9; Hayhurst Depo., p. 50-51 and 58-59; Buckingham Dec., ¶ 8. Despite this, Tom chose to retain Hayhurst and terminate Buckingham based on the discriminatory assumption that *her* family obligations somehow made her less willing or able to do her job.

Second, as noted above, Tom simply assumed Buckingham would not be willing to travel because of how many children she had at home. Tom Depo., p. 8. Hayhurst, by contrast, was not subjected to any assumptions. Instead, Tom emailed to ask whether he would be open to the supposedly-required travel schedule. *Id.* at 6.

And third, the supposed travel that Tom assumed Buckingham would be unwilling to do, never actually occurred. Hayhurst Depo., p. 52-53. As Hayhurst explained, the only travel he did between February 2011 and his eventual termination was a one day, red-eye and back trip between San Diego and Washington, D.C. *Id.* at 53.

---

[2]Booz Allen has refused to produce these training materials, which are the subject of a pending motion to compel. Docket Entry No. 23.

Title VII prohibits sex stereotyping discrimination, which occurs when employers assume that women's domestic duties – like caring for children and relatives – somehow trump their interest in or commitment to the workplace. In this case, the evidence is undisputed that a discriminatory assumption about Buckingham's domestic role motivated Matthew Tom's decision to retain Ben Hayhurst instead of the clearly better qualified Anne Buckingham. Tom admits he made assumptions about Buckingham's willingness to travel based upon the number of children she has, and also that classifying her as "a mom" would be discrimination on the basis of gender. And, Hayhurst's testimony about what Tom said stands unrebutted (because Tom does not recall the conversation). Because the record establishes that Buckingham's gender motivated Tom's decision, the Court should grant Buckingham partial summary judgment as to Title VII liability.

## ARGUMENT

### A.    Statutory and Historical Background.

Title VII makes it illegal to discriminate against employees on the basis of their sex. This includes not just refusing to hire, discharging, or otherwise discriminating against them, 42 U.S.C. § 2000e-2(a)(1), but also from limiting, segregating, or classifying them "in any way which would deprive or tend to deprive [them] of employment opportunities" because of their sex. 42 U.S.C. § 2000e-2(a)(2).

This statute is important for working women because "[t]here can be no doubt that our Nation has had a long and unfortunate history of sex discrimination." *Frontiero v. Richardson*, 411 U.S. 677 (1973) (plurality opinion); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83 (2000) (noting that women have been subjected to a "history of purposeful unequal treatment"). In the employment context especially, from this country's founding until at least the 1970's "state laws

supported a regime in which men and women were assigned, respectively, roles as workers and homemakers." *Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 862 (9th Cir.), *aff'd*, *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003). State-level legislation, under the guise of protecting women, "played a major role in limiting women's access to the workplace – and concomitantly, in discouraging the involvement of men in domestic duties, including caring for children and relatives." *Id.* at 861. Many of these laws were grounded in the "offensive assumption . . . 'that male workers' earnings are vital to the support of their families, while the earnings of female wage earners do not significantly contribute to their families' support.'" *Wengler v. Druggists Mutual Ins. Co.*, 446 U.S. 142, 148 (1980), quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 645 (1975). Needless to say, Congress responded to this shameful history of discrimination, at least in part, by passing Title VII. *Hibbs*, 538 U.S. at 729.

**B.      Employers Discriminate on the Basis of Sex When They Make Improper Assumptions About the Suitability of Women With Young Children to Be Present in the Workplace.**

The courts have had little difficulty in recent years divining gender discrimination in discriminatory attitudes exhibited towards women with small children. Indeed, the "fault line between work and family [is] precisely where sex-based generalization has been and remains strongest." *Hibbs*, 538 U.S. at 738. Thus, cases arising under Title VII, Title IX and 42 U.S.C. § 1983 all establish that sex discrimination occurs where women are subjected to improper assumptions about their capacity to be fully present in the workplace or in educational programs.

In *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (per curiam), for example, the company told Phillips that it was not accepting job applications from women with preschool-aged children, though it had no such policy regarding male applicants. Because the record established that 70-75% of applicants for the position that Phillips sought were women, and 75-80% of those hired were women, the trial and appellate courts found no gender discrimination and ruled for the

company.  The Supreme Court reversed, however, stating "that persons of like qualifications be given employment opportunities irrespective of their sex."  *Id.* at 544.  Thus, the lower courts had erred in reading Title VII as permitting one hiring standard for women with preschool-aged children and another for men.  *Id.*  The Court's per curiam opinion suggested that gender might in some circumstances be a bona fide occupational qualification, which led Justice Marshall to note in concurrence that the Court "has fallen into the trap of assuming that the Act permits ancient canards about the proper role of women to be a basis for discrimination.  Congress, however, sought just the opposite result."  *Id.* at 545 (Marshall, J., concurring).  Citing to the EEOC's Guidelines on Discrimination Because of Sex, Justice Marshall further noted that "characterizations of the proper domestic roles of the sexes were not to serve as predicates for restricting employment opportunity."  *Id.*

For a more modern view of how the courts deal with these "ancient canards", this Court need look no further than *Chadwick v. WellPoint, Inc.*, 561 F.3d 38 (1st Cir. 2009).  Chadwick, a longtime WellPoint employee, applied for promotion from Recovery Specialist II (a job she had performed for seven years) to Recovery Specialist Lead.  Chadwick was already performing many of the higher position's duties.  That, along with her excellent recent performance appraisal (scoring 4.4 on a 5 point scale), made her confident she would be selected.  The only other finalist, Donna Ouelette, had been a Recovery Specialist II for just a year and had been rated considerably lower than Chadwick on her most recent review.  *Id.* at 41.  The ultimate decision-maker was Nanci Miller, who just two months before had learned that Chadwick had an eleven year old son and six year old triplets.  *Id.* at 42.  Upon learning of the triplets, Miller made an exclamation bordering on pity.  *Id.* ("Oh my – I did not know you had triplets.  Bless you!").  And when breaking the news that the promotion was going to Ouelette, Miller told Chadwick: "It was nothing

you did or didn't do.  It was just that you're going to school, you have the kids and you just have a lot on your plate right now."  *Id.*  In the same conversation, Miller also told her that if the three interviewers (people other than Miller) were in Chadwick's position "they would feel overwhelmed."

The First Circuit wasted little time finding that making discriminatory assumptions about Chadwick's familial responsibilities "involves stereotyping based on sex." *Chadwick*, 561 F.3d at 44.  Citing to *Hibbs* and other authority, the court noted that "[t]he Supreme Court and several circuits, including this one, have had occasion to confirm that the assumption that a woman will perform her job less well due to her presumed family obligations is a form of sex-stereotyping and that adverse job actions on that basis constitute sex discrimination."  *Id.*  In the simplest terms, "these cases stand for the proposition that unlawful sex discrimination occurs when an employer takes an adverse job action on the assumption that a woman, because she is a woman, will neglect her job responsibilities in favor of her presumed childcare responsibilities."  *Id.* at 44-45.  Further,

> an employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family responsibilities.  The essence of Title VII in this context is that women have the right to prove their mettle in the work arena without the burden of stereotypes regarding whether they can fulfill their responsibilities.

*Id.* at 45.

*Back v. Hastings on Hudson Union Free School District*, 365 F.3d 107 (2nd Cir. 2004), which *Chadwick* cited, provides a prime example of this issue.  Back, an in-house elementary school psychologist, was fired instead of being granted tenure.  She filed a gender discrimination suit under 42 U.S.C. § 1983 alleging that her termination rested on the presumption "that she, as a young mother, would not continue to demonstrate the necessary devotion to her job, and indeed

that she could not maintain such devotion while at the same time being a good mother." *Id.* at 113.

The court framed the case as asking

> whether stereotyping about the qualities of mothers if a form of gender discrimination, and whether this can be determined in the absence of evidence about how the employer in question treated fathers. We answer both questions in the affirmative.

*Id.* Back was denied tenure following numerous comments and questions about how she could

possibly manage both her work and parental responsibilities. *Id.* at 116. The defendants argued,

unsuccessfully, that stereotypes about pregnant women or mothers were not based upon gender

but, rather, gender plus parenthood. *Id.* at 121. Thus, the defendants said, such decisions could

not be "presumed" to be on the basis of sex. *Id.* The court roundly rejected this argument:

> [The Supreme Court's decision in] *Hibbs* makes pellucidly clear, however, that, at least where stereotypes are considered, the notions that mothers are insufficiently devoted to work, and that work and motherhood are incompatible, are properly considered to be, themselves, gender-based. *Hibbs* explicitly called the stereotype that "women's family duties trump those of the workplace" a "*gender* stereotype," and cited a number of state pregnancy and family leave acts – including laws that provided *only* pregnancy leave – as evidence of "pervasive sex-role stereotype that caring for family members is women's work[.]"

*Id.* (internal citations to *Hibbs* omitted) (italics in original).

In *Lust v. Sealy, Inc.*, 383 F.3d 580 (7th Cir. 2004), another case cited in *Chadwick*, the

Seventh Circuit upheld the jury's finding of sex discrimination. In that case, like this one, the

decision-maker admitted not recommending Lust for a job "because she had children and he didn't

think she'd want to relocate her family, though she hadn't told him that." *Lust*, 383 F.3d at 583.

And in *Sheehan v. Donlen Corp.*, 173 F.3d 1039 (7th Cir. 1999), the Seventh Circuit found direct

evidence of discrimination where the decision-maker told Sheehan upon her firing that

"[h]opefully this will give you some time to spend at home with your children", and the next day

told a co-worker that "[w]e felt this would be a good time for Gina to spend some time with her

family." *Sheehan*, 173 F.3d at 1043 (facts) and 1044 (finding that these statements "provided direct evidence of discrimination").

Finally, the court found direct evidence of discrimination in *Tingley-Kelley v. Trustees of University of Pennsylvania*, 677 F. Supp.2d 764 (E.D. Pa. 2010). The plaintiff repeatedly applied for (and was rejected from) admission to the University of Pennsylvania's School of Veterinary Medicine. She filed suit, claiming that she was denied admission because of her gender in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. The evidence showed that the Admissions Committee in multiple years considered her status as a mother with young children and a husband in the Air Force when rejecting her applications. Some of the committee review forms mentioned concerns about "whether she could handle the rigors of Penn Vet's academic program, **given her childcare responsibilities**." 677 F. Supp.2d at 776-77 (emphasis added). On one form, a committee member openly expressed "concerns about how she'll do in school esp. w/ family, etc." and also that she "would be at school w/2 young children." *Id.* at 777. At her admissions interviews, meanwhile, Tingley-Kelley's childcare responsibilities were discussed at length. One interviewer asked why she did not move back to Boston where she would have more family support, and another questioned whether she was prepared to handle the program's rigors and care for her daughter if her husband were suddenly deployed. *Id.* The Court ultimately viewed this record as containing direct evidence that the Admission Committee members "discriminated against her on the basis of her gender by stereotyping her as a busy mother of young children who would have a difficult time handling both graduate school and her childcare responsibilities." *Id.* at 777 and 780 (noting that plaintiff had presented direct evidence of discrimination).[3]

---

[3]See also *Quinlan v. Elysian Hotel Co. LLC*, 916 F. Supp.2d 843, 850 n.5 (N.D. Ill. 2013) ("In any event, as discussed in the text, it *is* sex discrimination to fire a woman based on an employer's view that a new *mother* cannot, simply because she is a new mother, dedicate enough time or energy to the job.") (italics in original.).

**C.** **Booz Allen Hamilton Violated Title VII When it Chose Not to Retain Buckingham, At Least in Part, Because of Tom's Assumptions About Buckingham's Maternal Duties.**

Within this framework, it becomes evident that Buckingham has presented direct evidence that Tom's selection of Hayhurst over her violated Title VII. After all, to prevail Buckingham need only show that her "sex . . . was a motivating factor for [BAH's] employment practice, even though other factors [may have] also motivated the practice." 42 U.S.C. § 2000e-2(m).

The evidence here is undisputed. Tom responded to Hayhurst's inquiry about whether the job had first been offered to Buckingham by saying that with five children at home he assumed that Buckingham would not be interested in the allegedly-required travel. Hayhurst Depo., p. 34-35 ("And then he made a comment to the effect of, you know, she has a lot of kids, and traveling like this would probably be very difficult for her, so, you know, I think it's probably just not a good fit for her. Something to that effect."). He also told Hayhurst that Buckingham was supposedly "just kind of going to focus on being a mom right now, or just is interested in being a mom right now." *Id.* at 34. Because Tom has no recollection of the conversation, Hayhurst's testimony stands unrebutted. And of course, Tom readily admits that he made assumptions about Buckingham's willingness to travel "based upon her family responsibilities" and the fact "that she had five children at home." Tom Depo., p. 8. Tom admits that assuming that women would rather be home with their children instead of working evidences gender discrimination. *Id.* at 118-19.

But Title VII entitled Buckingham to the dignity of not being classified based upon discriminatory assumptions about her parenting role, and certainly not without Booz Allen even doing her the courtesy of asking whether she could accommodate the travel. *Lust*, 383 F.3d at 583 ("It would have been easy enough for Penters to ask Lust whether she was willing to move to Chicago rather than assume she was not and by so assuming prevent her from obtaining a

promotion that she would have snapped up had it been offered to her."). Hayhurst, by contrast, was specifically asked whether he was open to the supposed travel requirement. Tom Depo., p. 6.

The evidence in this case is no less direct than in *Tingley-Kelley*, 677 F. Supp.2d at 764, where the University of Pennsylvania assumed the plaintiff could not meet the academic program's rigors because of her childcare issues. It is no less direct than in *Sheehan*, where the woman's termination was explained as giving her "time to spend at home with [her] children." *Sheehan*, 173 F.3d at 1043-44. Here, Tom simply assumed without asking (Tom Depo., p. 75, 89, and 93) that because Buckingham had five children at home she would not be interested in traveling for work or remaining employed with the company she had been with for eleven years. Buckingham Dec., ¶ 2. This situation is even more incredible because the job went to a less qualified male who himself had refused work travel because he had two young children at home. Yet, Tom still viewed Hayhurst as more available and willing to travel than Buckingham.

This record conclusively establishes that Booz Allen violated Title VII. Discriminatory views of Anne Buckingham's availability, willingness, or interest in remaining employed factored into Tom's decision. Even if there were other factors in the decision, Booz Allen still violated the law. 42 U.S.C. § 2000e-2(m). The Court should grant Buckingham's motion and enter a partial summary judgment on liability in her favor.

## CONCLUSION

As discussed above, Title VII exists in part to strike at the discriminatory assumptions that men are breadwinners and women are caregivers, or that the dignity of work must be subordinated to women's culturally-presumed maternal duties. Spivak admits that Booz Allen Hamilton trained him about the impropriety of making decisions like the one Tom made about Buckingham. Tom testified that it would be gender discrimination to make job decisions based upon assumptions

14

about whether a female employee would rather be home with her children instead of working. Tom also admits assuming that because Buckingham had five children she was somehow less able or willing to be in the workplace. The evidence here is undisputed. Buckingham has demonstrated conclusively that her gender was a factor in Tom's decision. The Court should therefore grant Buckingham's motion for partial summary judgment regarding liability.

Respectfully submitted,

DOW GOLUB REMELS & BEVERLY, LLP

s/ Andrew S. Golub
Andrew S. Golub
Federal I.D. No. 13812
State Bar No. 08114950
asgolub@dowgolub.com
Stephanie A. Hamm
Federal I.D. No. 108779
State Bar No. 24069841
sahamm@dowgolub.com
9 Greenway Plaza, Suite 500
Houston, Texas 77046
Telephone: (713) 526-3700
Telecopier: (713) 526-3750

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

On August 22, 2014, I electronically submitted the foregoing document with the Clerk of the Court of the United States District Court for the Southern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel and/or pro se parties of record electronically using the CM/ECF filing system or by any other manner authorized by Federal Rule of Civil Procedure (5)(b)(2).

/s/ Andrew S. Golub
Andrew S. Golub