

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANNE BUCKINGHAM,<br>PLAINTIFF | §<br>§<br>§ | C.A. No. 4:13-cv-00392 |
| vs. | §<br>§<br>§ | |
| BOOZ ALLEN HAMILTON, INC.<br>DEFENDANT | §<br>§ | JURY TRIAL DEMANDED |

## DECLARATION OF ANNE BUCKINGHAM

1.  My name is Anne Buckingham. I am above the age of eighteen years and understand the nature and obligation of an oath. I have personal knowledge of each of the facts and statements contained in this Declaration and I declare under penalty of perjury that they are true and correct.

2.  I worked for Booz Allen Hamilton ("BAH" or "Booz Allen") for nearly eleven years. I worked as an Intelligence Analyst from February 2000 to July 2007, and then as an Associate on the Analytics-Intelligence and Operations Team from January 2008 to February 2011. Immediately before joining Booz Allen, I worked for the Central Intelligence Agency as an Intelligence Analyst and Career Service Trainee from June 1997 to February 2000.

3.  My last assignment with Booz Allen was as a Reports Officer at the United States Department of Homeland Security ("DHS"). In this position, I acted as an intelligence liaison between DHS and various governmental agencies located in Southeast Texas. I was based in Houston, Texas and worked for Booz Allen out of a home office.

4.  Booz Allen provided several personnel to DHS to work as Reports Officers. The only ones who were employed directly by Booz Allen, though, were me and Ben Hayhurst. We performed precisely the same job for DHS, but in different geographical areas. I was in Texas and he was in Southern California. The other Reports Officers Booz Allen provided to DHS were obtain through other companies acting as subcontractors to Booz Allen. In other words, those personnel were directly employed by the subcontractors whereas Ben and I were employees of Booz Allen.

5.  The DHS contract I was working on came to an end in early 2011. As a result, I was issued a Lack of Work notice, also known as a LOW notice. A true and correct copy of my LOW notice is attached to my Motion for Partial Summary Judgment as Exhibit 6. According to my LOW notice, my last date of employment with BAH was to be February 25, 2011.

6.  After being advised that I was going to be terminated if I could not find another assignment within Booz Allen, but before February 25, 2011, I became aware that the company had offered to continue Ben Hayhurst's employment. Specifically, I learned that he was going to continue working for DHS as a Reports Officer. No one at BAH ever contacted me to inquire whether I would be interested in remaining employed. Notably, Ben was junior to me in terms of both tenure with the company and experience. Needless to say, the position was not offered to me, and I was never contacted by Matthew Tom, who was Ben and my mutual boss, about it. He certainly never called to inquire whether I would be able to accommodate any so-called travel requirements for the position (and which I understand never actually was required).

7.  During my employment with Booz Allen, I never outright refused to travel for work. There was one occasion where I expressed some difficulty traveling to attend some meetings in the Washington, D.C. area that were scheduled at the last minute, because they conflicted with my running of the Houston Marathon and a family commitment in the middle of the following week. Nevertheless, I did manage to make it to Washington to attend a portion of the meetings.

8.  Notably, Ben Hayhurst was supposed to attend these same meetings. He did not attend any of them. My understanding is that he refused to travel because he had two small children in his house (including one who was just a few months old) and it would have been difficult for him to leave his wife to travel cross-country to attend the meetings. While our mutual supervisor was Mr. Tom, Ben somewhat reported to me so I was aware of his scheduling issues with respect to the January 2010 meetings in the D.C. area.

9.  I declare under penalty of perjury that the foregoing is true and correct.


SIGNED this __22__ day of __August__ , 2014.


_____
Anne Buckingham

# EXHIBIT 2

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    HOUSTON DIVISION

 4  ANNE BUCKINGHAM,            )

 5           Plaintiff,         )

 6      vs.                     ) C.A. No. 4:13-cv-0392

 7  BOOZ ALLEN HAMILTON,        )

 8  INC.,                       )

 9           Defendant.         )

10           *        *        *        *        *

11

12

13

14

15

16

17

18           The video deposition of DAVID RUBIN was

19  taken on Thursday, May 29, 2014, commencing at 9:32

20  a.m., at the offices of Littler Mendelson, P.C.,

21  1650 Tysons Boulevard, Suite 700, McLean, Virginia,

22  before Victoria Lynn Wilson, RMR, CRR, Notary

23  Registration No. 269770.

24

25           *        *        *        *        *
```

1      A.    Yes.

2      Q.    And I'm sorry.

3      A.    Yes.

4      Q.    Lawyers are attuned to this sort of thing.

5  I've got to prompt you to answer orally, audibly,

6  out loud.

7      A.    Sure.  Yes.

8      Q.    Not to be rude, just we need it for the

9  court reporter.

10          Did you know Ben Hayhurst?

11     A.    I may have met him once but I don't have

12 a -- a real recollection of him.

13     Q.    Okay.  You -- were you aware in 2011, early

14 2011, that he was a reports officer working for Booz

15 Allen Hamilton in San Diego?

16     A.    I think I believe I knew that at the time.

17     Q.    And Anne Buckingham was a reports officer

18 working for Booz Allen Hamilton in Houston?

19     A.    Yes.

20     Q.    And both of them -- strike that.

21          Reports officer was a Department of

22 Homeland Security position; correct?

23     A.    It was a position that we filled under a

24 contract.

25     Q.    Right.  But it was a Department of Homeland

1 Security position --

2     A.    So --

3     Q.    -- right?

4     A.    -- it was not a government position.  For

5 us, it was a contract that we held with the

6 Department of Homeland Security.

7     Q.    Yes.  The Department of Homeland Security

8 contracted with Booz Allen Hamilton to provide

9 personnel to fill a job that Department of Homeland

10 Security labeled "reports officer."

11     A.    So, Booz Allen had a contract to provide

12 services for reports officers that supported the

13 Department of Homeland Security.

14     Q.    Booz Allen Hamilton did not have, absent a

15 contract with the government, people sitting around

16 whose job was called "reports officer," did they?

17     A.    No.  Our positions are very basic.  We have

18 consultant, senior consultant, associate, lead

19 associate --

20     Q.    Exactly.

21     A.    -- senior associate.

22     Q.    Those are the Booz Allen Hamilton job

23 titles.

24     A.    Yes.

25     Q.    The Department of Homeland Security job

1  you, that whether someone was a -- an employee of a

2  subcontractor or a direct employee of Booz Allen

3  Hamilton, the rate that you were charging the

4  Department for Homeland Security for their work at

5  whatever labor category you billed them at was going

6  to be the same.  In other words, regardless of

7  whether they worked for you or were employed by a

8  subcontractor, if they were being billed as an

9  analyst 1, they got billed at the analyst 1 rate.

10      A.   So they could -- they could be -- could

11 move people up a labor category if they had new

12 skills or, you know, were serving -- had received

13 some type of degree.

14           MR. GOLUB:  I'm going to object as

15 nonresponsive.

16           BY MR. GOLUB:

17      Q.   And maybe I asked the question in a

18 confusing way, so I'll reask it.

19      A.   Okay.

20      Q.   Under your contract with DHS to provide

21 reports officers, if you had two personnel out there

22 in the field doing this work, let's say Anne

23 Buckingham and Brent Wise, Brent Wise worked for a

24 subcontractor called SGIS, Anne Buckingham was a

25 direct employee of Booz Allen Hamilton --

 1      A.    Right.

 2      Q.    -- the government didn't pay a different

 3 rate for Mr. Wise based on his subcontractor status;

 4 right?

 5            MS. HEADLEY:  Objection.  Form.

 6            THE WITNESS:  So they -- if I understand

 7 what you're saying, Mr. Wise was mapped to, you

 8 know, a particular labor category under the previous

 9 contract.

10            BY MR. GOLUB:

11      Q.    Correct.

12      A.    Okay.

13      Q.    The government was going to pay that rate

14 whether or not he was an employee of Booz Allen

15 Hamilton or an employee of a subcontractor.

16            MS. HEADLEY:  Objection.  Form.

17            THE WITNESS:  Right.

18            BY MR. GOLUB:

19      Q.    Right.  So the fact that someone is a

20 subcontractor doesn't have any effect on the billing

21 rate that you charge the government for his or her

22 time.

23      A.    So, it matters to us how we map them in our

24 profitability.

25            MR. GOLUB:  Objection.  Nonresponsive.

COMMONWEALTH OF VIRGINIA, to wit:

I, Victoria Lynn Wilson, before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any party, nor an employee of counsel, nor related to any party, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 16th day of June, 2014.

Commonwealth Of Virginia
Victoria Lynn Wilson - Notary Public
Commission No. 269770
My Commission Expires 5/31/2015

*Victoria Lynn Wilson*

VICTORIA LYNN WILSON

Notary Registration No. 269770

MY COMMISSION EXPIRES:   5/31/2015



# EXHIBIT 3

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4

  ANNE BUCKINGHAM,

5

         Plaintiff,

6                                    No. 4:13-CV-0392

     vs.

7

  BOOZ ALLEN HAMILTON, INC.,

8

         Defendant.

9  _____

10

11

12

13

14

15      VIDEOTAPED DEPOSITION OF BENJAMIN HAYHURST

16              San Diego, California

17            Tuesday, April 22, 2014

18                   Volume I

19

20

21

22  Reported by:

  JEANNE M. GARLOW

23  CSR No. 3456

24  Job No. 1844453

25  Pages 1 - 163

                                       Page 1

```
1    Hamilton?

2        A.   It's essentially the same job that I have

3    now as a federal employee.  I was in D.C. with Booz

4    Allen from June of '08, and I moved back to San

5    Diego in October of 2008.  And at that time, I began        08:13:29

6    working as a field reports officer, again,

7    supporting the Department of Homeland Security.  So

8    essentially in the same location that I'm at now,

9    but just I worked for Booz Allen, which had a

10   contract with Homeland Security, versus being a            08:13:45

11   federal employee.

12       Q.   Okay.  So if I understand it correctly,

13   Booz Allen had a contract with the Department of

14   Homeland Security to provide personnel to do the

15   reports -- field reports officer role?                     08:13:56

16       A.   Correct.  Yeah.

17       Q.   Okay.  Were there other field reports

18   officers --

19       A.   Yes.

20       Q.   -- around the country?                            08:14:04

21       A.   Yes.  There were several.

22       Q.   How many?

23       A.   I would say probably about ten.  Off the

24   top of my head, I can recall at one point we had

25   Phoenix, Tucson, El Paso, Houston, Miami.  There's a       08:14:14
```

Page 13

```
 1    couple in the north.  Like, for a while we had

 2    somebody in Wisconsin, I want to say, New Jersey.

 3    So, yeah.

 4        Q.   So those were just Booz Allen Hamilton

 5    employees serving as field reports officers?          08:14:33

 6        A.   Right.

 7             MS. HEADLEY:  Objection.  Leading.  Form.

 8             (Interruption by the reporter.)

 9             MS. HEADLEY:  Objection.  Leading.  Form.

10    Under our rules, that's what we say.  I'm not sure   08:14:40

11    about your rules.

12             Did you not get me?

13             THE VIDEOGRAPHER:  It's a little low.

14             MR. GOLUB:  Can you read back the question?

15    'Cause I forgot where we were at.                    08:14:58

16             (Record read.)

17             MS. HEADLEY:  Objection.  Form.  Leading.

18    BY MR. GOLUB:

19        Q.   And you can go ahead and answer.

20        A.   Okay.  Not all them were Booz Allen         08:15:17

21    Hamilton employees.  To my knowledge, most of them

22    worked for other companies that were subcontractors

23    to Booz Allen.

24    BY MR. GOLUB:

25        Q.   Okay.                                       08:15:27
```

                                                         Page 14

```
 1      A.   Yeah.

 2      Q.   Were there other field reports officers

 3  working for Department of Homeland Security, other

 4  than the ones that were either employed directly by

 5  Booz Allen Hamilton or subcontractors of Booz Allen      08:15:41

 6  Hamilton?

 7           MS. HEADLEY:  Objection.  Form.

 8           THE WITNESS:  So I answer still?

 9  BY MR. GOLUB:

10      Q.   Yes.                                            08:15:49

11      A.   Okay.  Yes.  At the end of my tenure there

12  were.  When I first began with Booz in that role,

13  there were not.  So in '08, when I first went out,

14  there -- there were only contractor field reports

15  officers, to my knowledge.  I didn't know of any       08:16:03

16  government employees.

17           Then near -- let's see.  In 2010, the

18  government let us know that they were probably going

19  to be ending the contract and hiring federal

20  employees into those positions, and then there was      08:16:20

21  kind of a transition where for a while there were

22  some government employees and some contractors.

23      Q.   So you -- you mentioned earlier that there

24  were field reports officers in certain specific

25  cities?                                                 08:16:36
```

Page 15

```
 1   other -- other contracts that Booz had with DHS.

 2       Q.   Is it correct that during most of your last

 3   year with Booz Allen Hamilton, that Matt Tom was

 4   your immediate supervisor?

 5            MS. HEADLEY:  Objection.  Form.  Leading.      08:19:02

 6            THE WITNESS:  Yes.  Yeah.

 7   BY MR. GOLUB:

 8       Q.   Let me -- let me ask the question in a

 9   slightly different way because --

10       A.   Sure.                                          08:19:09

11       Q.   -- there was an objection.

12       A.   Uh-huh.

13       Q.   Over the last year that you worked Booz

14   Allen Hamilton --

15       A.   Right.                                         08:19:13

16       Q.   -- who was your supervisor for most of the

17   time?

18       A.   Well, like I said, it was Bev and Matt.  So

19   there were some things, like -- I believe -- like, I

20   want to say, like, on -- because Matt had been          08:19:21

21   promoted, that Bev would handle, like -- like, if I

22   needed to request vacation time or something, I

23   believe that went to Bev.  But Matt was still the

24   person who was -- who would, like, give us updates

25   on what was happening with the contract.  He was        08:19:37
```

```
 1    kind of over everything.

 2          Matt was -- Matt's still the person that I

 3    put on my security clearance forms when I have to

 4    put a POC for, you know, my time at Booz Allen, and

 5    the government's going back to do my -- when they          08:19:48

 6    periodically redo my certain security clearance.

 7          Q.   Even today?

 8          A.   Even today, yeah, absolutely.  I just had

 9    my security clearance redo in February, and actually

10    I saw Matt Tom because I was back in D.C.                  08:19:59

11          Q.   POC means what?

12          A.   Point of contact.  So -- so anyway,

13    because -- because -- and part of that's because I

14    don't -- those other people were only for chunks of

15    my time, and -- and Matt Tom was over me directly         08:20:10

16    for at least a year, and then kind of the

17    overarching person for the last year or so, also --

18          Q.   Okay.

19          A.   -- to my -- best of my knowledge.

20          Q.   Who is Noah Spivak?                            08:20:21

21          A.   Noah Spivak was another Booz Allen person,

22    and he was higher up the chain than Matt.  And I met

23    him once or twice at -- once at Booz Allen and once

24    at DHS.  He's a Booz Allen employee who supports

25    their contracts at DHS.                                   08:20:39
```

                                                    Page 19

```
 1        A.   Right.

 2        Q.   Next level up was Noah Spivak, and the next

 3   level up was David Rubin?

 4        A.   That's my understanding, yeah.

 5        Q.   Okay.  You mentioned before a fellow field        08:21:50

 6   reports officer named Anne Buckingham.

 7             Who was she?

 8        A.   So Anne Buckingham, when I came on board

 9   with Booz, she was already working for Booz as a

10   field reports officer in Houston, to my knowledge.        08:22:02

11        Q.   Okay.

12        A.   She was one of the few people that was out

13   there before me.  I only met Anne in person once,

14   and that was in December of 2009.  We were both sent

15   to a training -- a required training by DHS.              08:22:14

16             But, yeah, so Anne was a fellow coworker, a

17   fellow reports officer.  To my knowledge, she and I

18   were the only Booz Allen employees that were field

19   reports officers and the other folks were all

20   subcontractors that worked for different companies.       08:22:29

21   Yeah.

22        Q.   Were her job duties any different than

23   yours in terms of the day-to-day?

24        A.   No.  As far as I know, we all had the same

25   job duties, just different geographic locations.          08:22:39
```

Page 21

```
 1        Q.   At least up until her separation --

 2        A.   Uh-huh.

 3        Q.   -- did she have the same reporting

 4    structure that you did?

 5        A.   Within Booz Allen?                          08:22:48

 6        Q.   Yes.

 7        A.   To my knowledge, yes.

 8        Q.   And you -- you just said within Booz Allen.

 9        A.   Right.

10        Q.   Was there a separate reporting structure     08:22:54

11    within DHS?

12        A.   Well, yeah.  So, you know, when you're a

13    federal contractor you have the company you work

14    for, and that --

15             (Interruption by the reporter.)            08:22:58

16             THE WITNESS:  Oh, I'm sorry.  No problem.

17    BY MR. GOLUB:

18        Q.   Go on.

19        A.   So as a federal contractor, you have the

20    company you work for, and the chain of command       08:23:08

21    you've talked about.  You also have a government

22    boss that you support on the contract, and there can

23    be a chain of command there.

24             As far as I know, all the field reports

25    officers, we all had the same chain of command, as   08:23:24
```

1    here in San Diego for the purpose of networking with

2    folks within that office and basically looking for

3    another job within Booz Allen.

4        Q.   And how long did that go on where you were

5    networking and looking for another job?             08:26:11

6        A.   Right.  It was a few weeks, I want to say.

7    I know it was near the -- I'm trying to remember.

8          It was either near the end of January or

9    somewhere into early February of 2011, then, that I

10   was there, and I was told that there was no work,     08:26:29

11   really, in San Diego that I was qualified for with

12   Booz Allen, and so that I would probably be laid

13   off.  That I could look for other work with Booz

14   Allen in other locations in Washington, D.C. and --

15   or elsewhere.  And then I was told, okay, wait,     08:26:50

16   actually, kind of in a last-minute thing, okay, wait

17   we -- we do have some funding for the contract so we

18   want to put you back on the contract with DHS.

19       Q.   Okay.  I want to break that down a little

20   bit, time-wise.                            08:27:08

21         Could you hand me the stickers and I'll put

22   them on myself.  Thank you very much.

23         Are you familiar with something called an

24   LOW notice?  Low notice?

25        A.   Yeah.                            08:27:22

1     Q.   What does that mean?

2     A.   I am.  Lack of work.  And so it's kind of

3  the way Booz Allen or I'm sure other companies use

4  it, too.

5         (Exhibit 1 was marked for identification by      08:27:31

6         the court reporter and is attached hereto.)

7  BY MR. GOLUB:

8     Q.   All right.  I'm going to hand you what I've

9  marked as Hayhurst Exhibit No. 1.

10     A.   Okay.                                       08:27:37

11     Q.   Can you tell us what this document consists

12  of?

13     A.   This is an e-mail from Matthew Tom to

14  myself, and there are -- cc'd in the e-mail is Mara

15  Edwards and Noah Spivak.  The e-mail is dated       08:27:53

16  January 28th, 2011.  Subject line is LOW -- LOW, all

17  in caps, LOW notice.  There's a PDF document

18  attached.

19         The text of the e-mail says, Hi Ben.  There

20  is a -- here is the LOW notice that we will discuss    08:28:10

21  at 1330.  And it's signed Matthew Tom, Booz Allen

22  Hamilton.

23     Q.   And what's the attachment?

24     A.   The attachment is a letter from Booz Allen

25  Hamilton to myself.  It looks more or less like a     08:28:25

```
 1   BY MR. GOLUB:

 2       Q.    Was there a point in time, after you were

 3   notified that you were going to be laid off, that

 4   you were told some additional funding had come

 5   through?                                              08:32:01

 6       A.    Yes.

 7       Q.    When was that and how were you notified?

 8       A.    I don't recall the exact date.  It was

 9   after the LOW notice, to my recollection.  I was --

10   I recall I was at home and I received a phone call    08:32:12

11   from Matt Tom, and he said that some things had

12   changed.  There was additional funding.  That I

13   needed to get in contact with the -- the Fusion

14   Center here in San Diego as quickly as possible to

15   get my badge back and a few other administrative      08:32:34

16   things, so that I could basically get back on the

17   contract as soon as possible.

18           (Exhibit 2 was marked for identification by

19            the court reporter and is attached hereto.)

20   BY MR. GOLUB:                                         08:32:46

21       Q.    Okay.  And let me -- let me show you

22   Hayhurst Exhibit No. 2.

23       A.    Okay.

24       Q.    At the bottom of -- of this document, it's

25   an exchange of e-mails between you and Mr. Tom,       08:32:57
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1        Q.   Did you have any verbal conversations with

 2   Mr. Tom about this job?

 3        A.   The only call -- the only verbal

 4   conversation I had was when he called me to tell me

 5   that I should get my badge back for the Fusion          08:35:26

 6   Center, take care of administrative things.

 7             That's -- to my recollection, that's the

 8   only verbal conversation we had, is when he called

 9   to tell me that.  Yeah.

10        Q.   Did -- did you ask him whether the job had    08:35:40

11   been offered to Anne Buckingham?

12             MS. HEADLEY:  Objection.  Form.  Leading.

13             THE WITNESS:  I did.

14   BY MR. GOLUB:

15        Q.   Okay.  What did you ask Mr. Tom, if           08:35:49

16   anything, about whether the job had been offered to

17   Anne Buckingham?

18        A.   My understanding was that there --

19             MS. HEADLEY:  Objection.  Form.  Leading.

20             THE WITNESS:  -- would be two of these        08:35:58

21   positions, and so I assumed that Anne and myself

22   would be the people to get it because we were the

23   only two Booz Allen employees, and as we discussed

24   earlier, the other folks were subcontractors.  So I

25   assumed, just kind of out of protocol, that we would   08:36:14
```

Page 33

```
 1   be the two folks to get it -- the job.

 2   BY MR. GOLUB:

 3       Q.   Okay.  Did Mr. -- how did Mr. Tom respond

 4   when you asked him whether the position had been

 5   offered to Anne?                                         08:36:32

 6       A.   He said no, that Anne was not going to be

 7   coming back on the contract.  I don't know if he --

 8   I don't recall if he said that it was offered to

 9   Anne or not.  I just know that he told me that Anne

10   would not be coming back -- excuse me -- would not       08:36:46

11   be coming back.  Yeah.

12       Q.   Did he say anything about whether he

13   thought Anne would be interested in coming back?

14       A.   The only --

15            MS. HEADLEY:  Objection.  Leading.  Form.       08:37:00

16   BY MR. GOLUB:

17       Q.   Go ahead.

18       A.   The comments he said to me were that

19   because the nature of the position had a lot of

20   travel, he didn't think Anne would really be            08:37:09

21   interested in it.  And the two phrases or two

22   wordings that -- that stick out in my mind is he

23   said something to the effect of I think she's just

24   kind of going to focus on being a mom right now, or

25   just is interested in being a mom right now.  And       08:37:24
```

```
 1    then he made a comment to the effect of, you know,

 2    she has a lot of kids, and traveling like this would

 3    probably be very difficult for her, so, you know, I

 4    think it's probably just not a good fit for her.

 5    Something to that effect.                               08:37:38

 6         Q.   And what did you think when he said that?

 7         A.   To be honest at the time, I really didn't

 8    think anything of it.  I just kind of thought, oh,

 9    yeah, well, that makes sense.

10         And, again, in my mind, because he didn't        08:37:47

11    say I offered -- he didn't say I offered it to Anne

12    and she turned it down, but he also didn't say I did

13    not even offer it to Anne.  Nothing was discussed as

14    far as if he'd offered it or not.

15         So in my mind, it was almost like, oh,            08:38:02

16    yeah, well, if that was me, I could -- I could see

17    that.  I wouldn't want to have to do that, either.

18         So, you know, myself, I'm a father.  At the

19    time I had two children.  I have three now.  It is

20    hard to travel when you have children.                 08:38:14

21         So I really didn't think much of it, to be

22    honest, until later when I mentioned it to Anne and

23    it was kind of more of a, oh, okay; hey, I heard

24    you're not going to be joining the contract.  You

25    know, good luck with whatever you're doing.  You       08:38:30
```

```
1    the firm.  She was a higher rank than me within the

2    Booz Allen structure.  She was one -- I believe I

3    was a level -- gosh, I'm forgetting now.  I was a

4    level 3, and she was a level 4, or I was level 2 and

5    she was a level 3.  But, anyway, I can't remember.        08:41:55

6    She was one level higher than me in the Booz

7    structure.  She had been on the contract with DHS

8    longer than I had.

9           So, basically, as far as all the ways you

10   can measure it, she was more senior to me.                08:42:07

11        Q.   All right.  And I'm going to ask you a

12   question, and I -- I want to preface this by saying

13   this is not intended to undermine or denigrate your

14   qualifications in any way --

15        A.   Sure, sure.  No problem.                         08:42:22

16        Q.   -- but did you consider Anne Buckingham to

17   be clearly better qualified for the job if there was

18   just one of them to be handed out?

19        A.   Sure.  Absolutely.

20           MS. HEADLEY:  Objection.  Form.  Leading.         08:42:32

21   BY MR. GOLUB:

22        Q.   Okay.

23        A.   Yes.

24        Q.   You mentioned her 10 or 15 years of service

25   in the government and the Social Security -- Social       08:42:38
```

Page 39

```
 1    I, an Analyst II?

 2         A.   I've heard people talk about it, but I --

 3    I'm not familiar with it, no.

 4         Q.   Okay.  So putting aside your lack of

 5    familiarity.                                        08:48:51

 6         A.   Sure.

 7         Q.   When you had the conversation with Matt Tom

 8    in February 2011, did he say anything to you at all

 9    about having picked you instead of Anne because of

10    how you were classified as an analyst for billing    08:49:08

11    purposes?

12         A.   No.

13              MS. HEADLEY:  Objection.  Form.  Leading.

14    BY MR. GOLUB:

15         Q.   Did he say anything at all about your       08:49:14

16    salary versus Anne's salary?

17         A.   No.

18              MS. HEADLEY:  Objection.  Form.  Leading.

19    BY MR. GOLUB:

20         Q.   Did he reference anything other than Anne's  08:49:21

21    family duties interfering potentially with her

22    willingness to travel or her happiness at just being

23    a mom?

24              MS. HEADLEY:  Objection.  Form.

25    Mischaracterizes testimony and leading.             08:49:34
```

```
 1              THE WITNESS:  No.  He did not.

 2   BY MR. GOLUB:

 3       Q.   And because of the objection, let me just

 4   ask:  did Mr. Tom, during the conversation, say those

 5   two things to you?  That Anne was just happy -- he          08:49:43

 6   thought Anne would just be happy being a mom, and he

 7   didn't think Anne would be interested in the travel

 8   because of her parental responsibilities?

 9              MS. HEADLEY:  Objection.  Form.

10              THE WITNESS:  He did say those two things,       08:49:56

11   yes.

12   BY MR. GOLUB:

13       Q.   All right.  And now you mentioned earlier

14   that you have three children now?

15       A.   Correct.                                           08:50:02

16       Q.   And how many did you have at -- at the time

17   of the conversation with Matt Tom?

18       A.   I had two children.

19       Q.   How old were they?

20       A.   Oh, goodness.  Okay.  So -- put me on the          08:50:11

21   spot as a dad here, so --

22       Q.   I'm not going to ask you when your wedding

23   anniversary was.

24       A.   Good.  February of 11 my daughter would

25   have been 2 1/2, approximately, and my son would           08:50:25
```

Page 47

```
 1    December, December 31st, 2009, and I'm talking about
 2    the reports officer offsite.  So that's -- an
 3    offsite is when they'll try to get everyone together
 4    from the whole country, so all the field reports
 5    officers in the various cities, the folks in D.C.,        08:53:12
 6    and they'll all get together somewhere.  In this
 7    case, I think it was going to be outside of D.C.
 8    somewhere.
 9         And I had just traveled -- so my son was
10    born in October of '09, and less than two months        08:53:27
11    after he was born, I traveled for a week for
12    training or -- mandatory training in December of '09
13    at the -- at the instruction of the Department of
14    Homeland Security, as part of the contract.
15         And then we were notified we were going to        08:53:44
16    have this offsite meeting.  And I want to say it was
17    roughly going to be in the -- in the beginning of
18    2010.  And so this is me asking Matt Tom --
19    basically saying -- I'll just read it.
20         I just want to talk to you about the RO           08:53:59
21    offsite with you.  Due to some family issues, it's
22    very difficult for me to travel.  I just attended
23    the RO basic course earlier because it was a
24    necessity, but I don't want to attend the offsite.
25    Also, at this point, I'm not really sure what the       08:54:13
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    purpose/value -- excuse me -- of the offsite will

 2    be, other than getting everyone together.  I'm happy

 3    to dial inasmuch as they'd like me to so I can be in

 4    the loop, but traveling seems unnecessary.  I know

 5    Skip, government supervisor, sent out an e-mail          08:54:28

 6    today saying he doesn't have the funding authorized

 7    yet.  Additionally, since I don't have a task

 8    order/work authorization for anything past 15

 9    January, I can't really book travel even if I wanted

10    to.  Let me know what you think.                         08:54:43

11        Q.   Did you end up going to the reports officer

12    offsite?

13        A.   I did not, no.

14        Q.   And the person -- well, strike that.

15             Who was the manager to whom you were           08:54:53

16    directing the comment that you could not travel

17    because of your family responsibilities?

18        A.   Matt Tom.

19        Q.   The job that you continued performing after

20    February of 2011, is -- was there -- was there          08:55:33

21    anything different from the job that you were

22    performing before you'd been put on the beach?

23        A.   Actually, there was not.

24        Q.   Same job?

25        A.   Same job, correct.                             08:55:47
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1      Q.   So is there any reason why Anne Buckingham

 2   could not have performed that job?

 3           MS. HEADLEY:  Objection.  Form.

 4           THE WITNESS:  I would assume not.  I don't

 5   know.                                          08:55:56

 6   BY MR. GOLUB:

 7      Q.   In terms of the job duties?

 8      A.   As far as I know, no, I wouldn't see any

 9   reason why not.

10      Q.   Okay.  The heavy travel schedule that Mr.   08:56:01

11   Tom mentioned --

12      A.   Right.

13      Q.   -- the three to four weeks out --

14      A.   Right.

15      Q.   -- and two weeks back --                   08:56:08

16      A.   Right.

17      Q.   -- did that ever actually materialize?

18      A.   No, it did not.

19      Q.   Did any travel materialize before you were

20   finally terminated in November?                   08:56:18

21      A.   Not for me, no.  I was the -- the only

22   travel I had to do was -- it was either early

23   February -- I'm sorry -- either -- sometime in

24   February, once I went back on the contract, or it

25   may have been early March.  I can't remember.  Matt  08:56:33
```

```
 1    Tom told me I needed to come to D.C. very quickly

 2    for a meeting regarding this whole plan to travel

 3    stuff.

 4            And so I caught a redeye to D.C.  I was at

 5    the Department of Homeland Security for one day, for      08:56:52

 6    meetings regarding this planned project that

 7    involved myself and others supposedly traveling.

 8    And then I came back to San Diego that same day or

 9    night.  So I was really only there for one day.  And

10    then the rest of the time I was supporting the           08:57:07

11    contract, there was no additional travel that I

12    recall.

13        Q.   As you continued working for Booz Allen

14    Hamilton throughout most of the rest of 2011, did

15    you ever participate in any way in an internal           08:57:25

16    investigation about Anne's complaint of

17    discrimination?

18        A.   Yes.

19        Q.   When and what did that consist of?

20        A.   I don't recall the exact dates.  We have --     08:57:36

21    we have documents, thankfully.

22            But to my knowledge what happened was Anne

23    filed some kind of a complaint internally with Booz

24    Allen.  I was contacted by two folks from Booz

25    Allen.                                                   08:57:52
```

```
 1        A.    All right.

 2              (Exhibit 7 was marked for identification by

 3               the court reporter and is attached

 4               hereto.)

 5    BY MR. GOLUB:                                          09:02:08

 6        Q.    I've just handed you what's been marked as

 7    Hayhurst Exhibit 7.

 8        A.    Okay.

 9        Q.    This is a further follow-up --

10        A.    It is.                                       09:02:21

11        Q.    -- that you sent to Mr. Witten and Ms. Wong

12    on August 22, correct?

13        A.    Okay.  So maybe that's why I'm not

14    remembering, because this was a follow-up to a

15    follow-up, yeah.                                       09:02:30

16        Q.    And you -- you told them that you had

17    thought of something today and it might be relevant

18    to their investigation?

19        A.    Correct.

20        Q.    And what is the thing that you communicated  09:02:37

21    to them?  And you don't need to read it verbatim --

22        A.    Sure.

23        Q.    -- but just kind of describe what it was.

24        A.    I described basically that my son was born

25    the end of October '09.  I took two weeks of leave    09:02:47
```

```
 1    and returned in early November of '09 to work.  That
 2    I -- that DHS wanted their reports officers to
 3    travel to an offsite in late November, and then to
 4    attend a one-week training course, also.  And that I
 5    expressed to Matt Tom that it would be too hard on          09:03:04
 6    my wife to care for a 15-month-old, my daughter, as
 7    well as my newborn son, and that I'd like to stay
 8    home.
 9            I'd say Matt was annoyed with me, but I
10    remained firm and said I could not go.  Then Matt          09:03:16
11    called me and said that he went and talked to Jon
12    Wilham, reports officer branch deputy, and Skip
13    Vandover, the reports officer branch chief.
14            Matt said that their reply to my need to be
15    with my family was, quote, so what, end quote, and         09:03:31
16    that he agreed with them.  He reiterated that I
17    needed to go on both trips.
18            Shortly after that, I got a call from my
19    direct government supervisor, Senior Reports Officer
20    Luke Rutherford, who asked me --                           09:03:44
21            (Interruption by the reporter.)
22            THE WITNESS:  I'm sorry -- who asked me if
23    I was going on these two trips.  I told him that
24    didn't want to go due to my newborn son, et cetera.
25    Luke agreed and said that taking care of my family         09:03:58
```

Veritext National Deposition & Litigation Services
866 299-5127

1    I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4    That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were duly sworn; that a record

8  of the proceedings was made by me using machine

9  shorthand which was thereafter transcribed under my

10  direction; that the foregoing transcript is a true

11  record of the testimony given.

12    Further, that if the foregoing pertains to

13  the original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [  ] was [  ] was not requested.

16    I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or party to this action.

19    IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated:  05/01/2014

23

24              *Jeanne Garlow*

              JEANNE M. GARLOW

25                CSR NO. 3456

                                    Page 163

# EXHIBIT 4

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    HOUSTON DIVISION

 4

 5  ANNE BUCKINGHAM,                )

 6              Plaintiff,          )

 7          vs.                     )  C.A. No.

 8  BOOZ ALLEN HAMILTON, INC.,      )  4:13-cv-0392

 9              Defendant.          )

10          *        *        *         *         *

11

12

13

14

15

16

17

18          The video deposition of MATTHEW TOM was

19  taken on Wednesday, May 28, 2014, commencing at

20  9:38 a.m., at the offices of Littler Mendelson,

21  1650 Tysons Boulevard, Suite 700, McLean,

22  Virginia, before Carol A. Lowe, RPR, Notary

23  Registration No. 125338, Notary Public.

24

25          *        *        *         *         *
```

 1  follows:

 2                      EXAMINATION

 3           BY MR. GOLUB:

 4      Q.   Mr. Tom, why did you assume that Anne

 5  Buckingham would not be able to accommodate three

 6  to four weeks of travel at a time?

 7      A.   I made that assumption, because

 8  previously she could not travel when the client

 9  requested her to travel.

10      Q.   Why didn't you make that assumption about

11  Ben Hayhurst?  He had refused to travel on your

12  instructions, hadn't he?

13      A.   He did.

14      Q.   So why did you assume that Anne would not

15  be able to travel but that Ben would?

16           MS. HEADLEY:  Objection; form.

17      A.   I actually made the same assumption with

18  Ben.

19           BY MR. GOLUB:

20      Q.   And how did you clear up your confusion

21  about whether or not Ben would be able or willing

22  to travel?

23      A.   I sent him an e-mail to see if he would

24  be open to that type of travel schedule.

25      Q.   You didn't send Anne Buckingham such an

1 e-mail, did you?

2     A.   I did not.

3     Q.   Why not?

4     A.   I initially was drafting an e-mail to

5 both of them.  And in the middle of the e-mail I

6 remembered to go ahead and check my labor

7 categories to find out financially if both of them

8 could fit in the new contract.

9           And when I checked the labor categories

10 at that time I found that Anne Buckingham was

11 aligned to an analyst two labor category and Ben

12 Hayhurst was aligned to the analyst one labor

13 category.

14     Q.   And do you have a copy of this draft

15 e-mail that you started drafting?

16     A.   I do not.

17     Q.   What was the date that you drafted that

18 e-mail?

19     A.   I don't remember, but it was right around

20 the same time that I sent the e-mail to Ben

21 Hayhurst asking if he would be open to a -- a

22 position with that type of travel schedule.

23     Q.   And it's your testimony, Mr. Tom, that

24 you did not attribute Ms. Buckingham's presumed

25 inability or difficulties with traveling to her

1 family responsibilities?

2          MS. HEADLEY:  Objection; form.

3          THE WITNESS:  Can you repeat the

4 question?

5          MR. GOLUB:  Sure.  Can you read that

6 back, please.

7          (The record was read as requested.)

8     A.   I made that assumption, yes.

9          BY MR. GOLUB:

10    Q.   You made the assumption based upon her

11 family responsibilities?

12    A.   Yes.

13    Q.   The fact that she had five children at

14 home.

15    A.   Yes.

16    Q.   Okay.  And you made that assumption

17 because she was a mom; correct?

18    A.   No.  I made that assumption because, as

19 we just discussed, she had turned down the travel

20 previously and cited family obligations as the

21 reason for not being able to do it.

22          I also base that assumption off of the

23 fact that when I did talk to her on what she would

24 want to do moving forward if the contract ended,

25 she told me that she didn't want to go outside of

1  Houston.

2          Because I was looking for new positions

3  and asked if she was willing to work outside of

4  Houston.  And she said she -- she wasn't.

5      Q.   Do you remember what you told

6  Mr. Hayhurst when he inquired whether you had

7  offered the position of traveling reports officer

8  to him?

9      A.   I do not.  I don't recall that.

10     Q.   So you would defer to his recollection

11  about what you said?

12          MS. HEADLEY:  Objection; form.

13     A.   I would -- I would not defer to him.  I

14  just don't recall even having a discussion with

15  him.

16          BY MR. GOLUB:

17     Q.   I'll put it this way.  You don't have any

18  independent recollection of what you said during

19  that conversation, do you?

20     A.   No.

21     Q.   All right.  Do you recall telling him --

22  well, strike that.  Let me ask it this way.

23          Did he ask whether or not you had offered

24  the position to Anne Buckingham?

25     A.   I don't recall.

1     Q.    Okay.  At some point in time Anne

2 Buckingham communicated a complaint about the

3 decision to keep Mr. Hayhurst and not to keep her;

4 correct?

5     A.    Not to me.  She asked a question on why

6 it wasn't offered to her; something like that.

7     Q.    She posed a question to Noah Spivak?

8     A.    It was to me with Noah on the e-mail, I

9 believe.

10     Q.    And then eventually or later on she made

11 a complaint to David Rubin?

12     A.    Yeah, I believe that's correct.

13     Q.    And at that point in time HR did an

14 investigation?

15     A.    Correct.

16     Q.    Were you truthful when you were

17 interviewed by HR in the course of that

18 investigation?

19     A.    Yes.

20     Q.    You told them everything that you knew?

21     A.    Yes.

22     Q.    Didn't leave anything out?

23           MS. HEADLEY:  Objection; form.

24     A.    Not that I can remember, no.

25           BY MR. GOLUB:

1 function on the new contract.

2     A.   Correct.

3     Q.   And the nature of the work both on old

4 and new was going to be the same except the new

5 contract was going to be based out of D.C.

6     A.   Correct.

7     Q.   And, by the way, just to go back, the

8 position that Ben -- strike that.

9          The jobs that Ben Hayhurst and Anne

10 Buckingham performed on the old contract were the

11 same jobs, just in different locations.

12     A.   I would say they're similar jobs, yes.  I

13 think Anne was more seen as a senior person to

14 mentor Ben and some of the other reports officers

15 out there.

16     Q.   Right.  But they were both reports

17 officers.

18     A.   Correct.

19     Q.   And was that a Booz Allen Hamilton title

20 or was that a Department of Homeland Security

21 title?

22     A.   That was a Department of Homeland

23 Security title.

24     Q.   I see.  So as far as DHS was concerned

25 they were both performing the same job just in

1 different geographic areas.

2     A.    Yes, you could say that.

3     Q.    But within Booz Allen Hamilton Anne

4 Buckingham was seen as the more senior, more

5 experienced of the two.

6     A.    Correct.

7     Q.    In terms of performing a reports officer

8 job, would you agree that Anne Buckingham was

9 better qualified than Ben Hayhurst to perform it?

10    A.    More experienced, if that's what you're

11 asking.

12    Q.    I'm really asking about qualifications.

13 Was she more qualified than Ben Hayhurst to

14 perform the reports officer position in, let's

15 say, the beginning of 2011?

16    A.    Yeah, it's a subjective judgment.  But,

17 yes, I would say so.

18    Q.    Would you -- would you say that she was

19 clearly better qualified than Ben Hayhurst to

20 perform the job?

21    A.    I would say she's better qualified, yes.

22    Q.    But -- but you wouldn't go so far as to

23 say she was clearly better qualified?

24    A.    Based off her experience and Ben's

25 experience you could say that.

1     Q.    That she was clearly better qualified.

2     A.    (Inaudible.)

3     Q.    Was that a yes?

4     A.    Yes.

5     Q.    Okay.  I was asking you before we got off

6 on this tangent about documents from before the

7 decision was made regarding or -- or documenting

8 the reason for the decision.  And you pointed me

9 to the staffing matrix and the contracts both old

10 and new.

11     A.    Yes.

12     Q.    Those are documents you say you looked at

13 at some point in February 2011?

14     A.    I based the decision off of looking at my

15 staffing roster, yes.

16     Q.    Are there any documents that exist in

17 which the decision or the decision-making process

18 was documented, in other words, e-mails or memos

19 or correspondence between you and anyone else

20 saying here's what I'm considering, here are the

21 factors that I'm looking at, here's what's going

22 into my decision-making about who to fill the

23 reports officer position on the new contract with?

24     A.    No documents to my knowledge.

25     Q.    Okay.  Did you speak to anybody or confer

```
 1          BY MR. GOLUB:
 2      Q.   And you were -- you were aware that Anne
 3  Buckingham had five children; correct?
 4      A.   I was.
 5      Q.   And you -- you were assuming that with
 6  her parental responsibilities she would find it
 7  difficult to be out of Houston for three to four
 8  weeks at a time.
 9          MS. HEADLEY:   Objection; form.
10          BY MR. GOLUB:
11      Q.   Right?
12      A.   I assumed that, yes.
13      Q.   Did you ever tell anyone within Booz
14  Allen that she was just happy doing the mom thing?
15      A.   No.
16      Q.   You don't recall saying that to anyone?
17      A.   No.
18      Q.   And if you said it to Ben Hayhurst during
19  your conversation with him, you have no
20  recollection of that?
21      A.   Yes, I have no recollection.
22      Q.   And yet Ben Hayhurst was the one who was
23  completely unwilling to travel even for part of
24  the all-hands meeting because of his parental
25  duties; right?
```

1     A.    Would I agree with that?

2     Q.    Yeah.  Is that inappropriate?

3     A.    That is.

4     Q.    Why?

5     A.    You know, I think -- well, in what

6  context, I guess?

7     Q.    Well, if you decided that you were going

8  to retain a male employee and not a male employee

9  because she was just happy being a mom --

10          MS. HEADLEY:  I think you want to start

11  over again.  You said a male and then a male.

12          MR. GOLUB:  Yeah.  Probably because it's

13  lunchtime.

14          MS. HEADLEY:  Low blood sugar.

15          MR. GOLUB:  Even -- even back in Houston

16  it's lunchtime.  Let me start the question over.

17          BY MR. GOLUB:

18     Q.    So, for example, if you were having to

19  choose between two employees, a man and a woman,

20  who to keep and who to retain and you thought, you

21  know what, I think my female employee would

22  probably just be happy staying at home and being a

23  mom and so that's going to factor into my decision

24  to keep the guy, that's the context.

25          So why would -- why would that be

1 inappropriate in that context?

2          MS. HEADLEY:  Objection; form.

3          BY MR. GOLUB:

4     Q.    If you think -- if you think it would be.

5          MS. HEADLEY:  Objection; form.

6     A.    Well, assuming that there's no other

7 previous discussions with the female employee, I

8 think it's inappropriate because you're making a

9 decision based off of, you know, something that

10 wasn't discussed with the employee here, you know,

11 just assuming they don't want to have a job or

12 stay at home or whatever the words you used, stay

13 at home and be a mom.

14          BY MR. GOLUB:

15     Q.    Right.  It's -- it's kind of prejudiced

16 to think that women just want to stay home with

17 their children and so that's a good thing for

18 them; right?

19     A.    Right.

20          MS. HEADLEY:  Objection; form.

21          BY MR. GOLUB:

22     Q.    You would agree with me that to say

23 something like that would be some indication of

24 gender bias?

25          MS. HEADLEY:  Objection; form.

 1      A.    Yes.

 2            BY MR. GOLUB:

 3      Q.    To make a statement like that, you would

 4 consider that not to be particularly EEO friendly,

 5 wouldn't you?

 6            MS. HEADLEY:  Are we basing that on all

 7 of the prior assumptions built into that question?

 8            MR. GOLUB:  Yeah.

 9            BY MR. GOLUB:

10      Q.    If -- if you were -- if you made a

11 statement that a female employee would probably

12 just be happy staying at home being a mom, you

13 would agree that that would not be an EEO friendly

14 thing to say.

15      A.    If it's tied to the decision on whether

16 to give her a job or not, yes.

17            MR. GOLUB:  Okay.  Pass the witness.

18            MS. HEADLEY:  Reserve questions for time

19 of trial.

20            MR. GOLUB:  Thank you, Mr. Tom.

21            THE WITNESS:  Thank you.

22            MR. GOLUB:  Appreciate your time.

23            MR. VOIGTSBERGER:  The deposition is

24 concluded.  And we're off the record at 12:51.

25            (Reading and signature not waived.)

```
 1    COMMONWEALTH OF VIRGINIA, to wit:

 2              I, Carol A. Lowe, before whom the

 3    foregoing depositions were taken, do hereby

 4    certify that the within-named witnesses personally

 5    appeared before me at the time and place herein

 6    set out and after having been duly sworn by me,

 7    according to law, was examined by counsel.

 8              I further certify that the examination

 9    was recorded stenographically by me and this

10    transcript is a true record of the proceedings.

11              I further certify that I am not of

12    counsel to any party, nor an employee of counsel,

13    nor related to any party, nor in any way

14    interested in the outcome of this action.

15              As witness my hand and notarial seal this

16    16 day of June           , 2014.

17

18

19

                   CAROL A. LOWE, RPR, Notary Public

20
                   Notary Registration No. 125338
21

22    MY COMMISSION EXPIRES:        12/31/2016
```

# EXHIBIT 5

Booz | Allen | Hamilton

Booz Allen Hamilton Inc.
8283 Greensboro Drive
McLean, VA 22102

Tel 1-703-902-5000
Fax 1-703-902-3500

www.boozallen.com

January 28, 2011

Ben Hayhurst

Dear Ben:

We appreciate your contributions and service during the time you have spent with Booz Allen Hamilton. Confirming your discussion with Matthew Tom, your employment with the firm is being terminated due to a lack of billable work matching your skill set. We regret this action is necessary.

The Firm's termination policy entitles you to 3 weeks of notification based on your length of service. Your last day of employment with the Firm will be February 18, 2011. This date has been figured into your notification pay. In addition, you will be paid for any unused PTO (Paid Time off) and floating holidays.

To aid in your transition to a new job opportunity, you will not be required to perform client or firm-related work after today. However, please ensure that you continue to enter time in to TOL on a daily basis. You should charge 8 (eight) hours per day to the charge number G0SCAC000000000000000. Because you meet the eligibility requirements, you may register for Career Mobility for assistance in locating an appropriate position within the firm. Please enroll in Career Mobility as soon as possible by visiting careermobility.bah.com and following the directions provided. After you are accepted, you will receive an email providing guidance on how to utilize the program. It is very important that you actively review the job openings and apply online to positions of interest. We encourage you to be proactive in reaching out to recruiters and managers who have available positions for which you are qualified.

Please ensure you return all firm confidential and proprietary information, client information and files, working papers, employee reference manuals, computers, keys, facility access cards, credit cards and all other client and company property to your manager.

A benefits out processing packet will be mailed to your home address via Federal Express. The benefits packet contains information on extending your (COBRA) benefits, information on your ECAP, and other relevant materials. If you have any questions regarding out processing from the firm, please contact our help desk at (877) 927-8278 or email at helpdesk@bah.com.

Ben, we regret the need for this action and wish you the best of luck in your future career opportunities.

Sincerely,

*Robt S. Rubin*

BOOZ ALLEN HAMILTON INC.

David Rubin
Senior Vice President

BAH 2256 [Buckingham]



# EXHIBIT 6

Booz | Allen | Hamilton

Booz Allen Hamilton Inc.
8283 Greensboro Drive
McLean, VA 22102

Tel 1-703-902-5000
Fax 1-703-902-3500

www.boozallen.com

January 28, 2011

Anne Buckingham

▮▮▮▮▮▮▮▮

Dear Anne:

We appreciate your contributions and service during the time you have spent with Booz Allen Hamilton. Confirming your discussion with Matthew Tom, your employment with the firm is being terminated due to a lack of billable work matching your skill set. We regret this action is necessary.

The Firm's termination policy entitles you to 4 weeks of notification based on your length of service. Your last day of employment with the Firm will be February 25, 2011. This date has been figured into your notification pay. In addition, you will be paid for any unused PTO (Paid Time off).

To aid in your transition to a new job opportunity, you will not be required to perform client or firm-related work after today. However, please ensure that you continue to enter time in to TOL on a daily basis. You should charge 8 (eight) hours per day to the charge number G0SHPC000000000000000. Because you meet the eligibility requirements, you may register for Career Mobility for assistance in locating an appropriate position within the firm. Please enroll in Career Mobility as soon as possible by visiting careermobility.bah.com and following the directions provided. After you are accepted, you will receive an email providing guidance on how to utilize the program. It is very important that you actively review the job openings and apply online to positions of interest. We encourage you to be proactive in reaching out to recruiters and managers who have available positions for which you are qualified.

Please ensure you return all firm confidential and proprietary information, client information and files, working papers, employee reference manuals, computers, keys, facility access cards, credit cards and all other client and company property to your local manager.

A benefits out processing packet will be mailed to your home address via Federal Express. The benefits packet contains information on extending your (COBRA) benefits, information on your ECAP, and other relevant materials. If you have any questions regarding out processing from the firm, please contact our help desk at (877) 927-8278 or email at helpdesk@bah.com.

Anne, we regret the need for this action and wish you the best of luck in your future career opportunities.

Sincerely,

BOOZ ALLEN HAMILTON INC.

David S. Rubin
Senior Vice President



# EXHIBIT 7

Yep,

It's that assumption that gets us in trouble.

HR is already scrambling.

Have a great trip!

Noah

PS: Don't forget new batteries for the camera.

---

**From:** Tom, Matthew [USA]
**Sent:** Friday, February 25, 2011 3:30 PM
**To:** Spivak, Noah [USA]
**Subject:** RE: New Initiative in DHS Reports Officer program

Hi Noah,

Okay I'll wait for HR to respond to your request. In my mind it's pretty simple. The available LCATs on contract for the traveling RO effort do not fit Anne's cost structure. She would have to be aligned to a higher LCAT in order for us not to take a loss. That is the main reason I didn't consider her. Plus, she will probably not be able to accommodate 3-4 weeks of travel at a time, but that is an assumption.

**Matthew Tom**
Booz | Allen | Hamilton

Tel: 202 447 3579
BB: 703-439-9724
tom_matthew@bah.com

---

**From:** Spivak, Noah [USA]
**Sent:** Friday, February 25, 2011 3:12 PM
**To:** Tom, Matthew [USA]
**Subject:** FW: New Initiative in DHS Reports Officer program
**Importance:** High

Matt,

If you are still checking mail. Please do not respond to this until we have a chance to talk. I have asked HR to help with an appropriate response.

Noah

---

**From:** Buckingham, Anne [USA]
**Sent:** Friday, February 25, 2011 2:53 PM
**To:** Tom, Matthew [USA]
**Cc:** Rubin, David [USA]; Spivak, Noah [USA]

**Subject:** New Initiative in DHS Reports Officer program

Matt-
I understand from Ben that there is a new initiative underway in the Reports Officer branch and that Booz Allen has offered to put Ben on the contract. Both of us were surprised given that I have more experience in the RO branch and a longer tenure at Booz Allen. Is there a reason Booz Allen did not offer such a position to me? Thanks. --Anne Buckingham



# EXHIBIT 8

<pre>
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    HOUSTON DIVISION

 4

 5 ANNE BUCKINGHAM,                )

 6            Plaintiff,           )

 7        vs.                      )  C.A. No.

 8 BOOZ ALLEN HAMILTON, INC.,      )  4:13-cv-0392

 9            Defendant.           )

10        *        *        *        *        *

11

12

13

14

15

16

17

18        The video deposition of NOAH SPIVAK was

19 taken on Wednesday, May 28, 2014, commencing at

20 1:55 p.m., at the offices of Littler Mendelson,

21 1650 Tysons Boulevard, Suite 700, McLean,

22 Virginia, before Carol A. Lowe, RPR, Notary

23 Registration No. 125338, Notary Public.

24

25        *        *        *        *        *
</pre>

1 businessman, not an HR or a lawyer.

2      Q.   Well, certainly, Mr. Spivak, as an

3 experienced and senior business executive with

4 Booz Allen Hamilton and now General Dynamics you

5 are aware that company managers should not be

6 making personnel decisions based upon their

7 assessment of whether a woman would just rather be

8 home with her children; right?

9      A.   That's not what happened in this case.

10     Q.   You would agree...

11          MR. GOLUB:  Objection; nonresponsive.

12          BY MR. GOLUB:

13     Q.   You would agree with me, wouldn't you,

14 Mr. Spivak, that it would be inappropriate to make

15 a personnel decision based upon a manager's

16 assumption that some woman would rather be home

17 with her kids, just being a mom rather than

18 gainfully employed in the workplace?  That's

19 inappropriate, isn't it?

20     A.   It's not an appropriate question.  It

21 is -- it's not what happened in -- in this case.

22          MS. HEADLEY:  It's a question he can ask

23 and you can answer.

24          THE WITNESS:  Okay.

25          BY MR. GOLUB:

1      Q.    It's not an inappropriate question --
2 it's not an appropriate question?
3      A.    I would have concerns to hear that
4 personnel decisions were made based on assumptions
5 about whether someone wanted to stay home and be a
6 mom.
7      Q.    Why would you have such concerns?
8      A.    It's a circumstance that was flagged in
9 training that I've received from Booz Allen.  I
10 think I'll stop there.
11     Q.    Any other reason other than training that
12 you've received from Booz Allen?
13     A.    I -- I'm sure there are, but nothing is
14 coming to mind.
15     Q.    And what was it that you gleaned from
16 this Booz Allen Hamilton provided training that
17 makes you think that a personnel action based on
18 assuming someone just wants to stay home and be a
19 mom would be inappropriate?
20     A.    I think it could give the misperception
21 of somehow treating people unfairly based on
22 family status or something like that.
23     Q.    Or gender?  Is that one of them?
24     A.    I know that's another -- I don't know
25 what they're called -- protected --

1     Q.    Protected class?

2     A.    Okay.

3     Q.    But in -- but in terms of this training,

4  was that the context in which they said making

5  such a -- or using that criteria for a personnel

6  decision might be a form of discrimination?

7           MS. HEADLEY:  Objection; form.

8           BY MR. GOLUB:

9     Q.    Is that what they taught you?

10          MS. HEADLEY:  Objection; form.

11    A.    I don't know if those were the words that

12 were used.

13          BY MR. GOLUB:

14    Q.    What kind of training was this?

15    A.    Recruiting.  Possibly EEOC.

16    Q.    So this was training about how to make

17 sure you're in compliance with the laws that

18 prohibit discrimination on the basis of things

19 like gender.

20    A.    I don't know if it was that as much as

21 being aware what the rules were and knowing when

22 to involve human resources and legal who are

23 experts in -- in that.

24    Q.    And -- and so the EEO training that you

25 received from Booz Allen taught you that you

1 shouldn't be making personnel decisions based on

2 assumptions that a woman with kids is just going

3 to be happy staying home with her kids.

4      A.   I -- I don't know that it addressed that

5 specific scenario.

6      Q.   But -- but you gleaned that from the

7 training; that it would be inappropriate to make

8 such an assumption about a woman with children.

9      A.   To the best of my recollection, yes.

10     Q.   Did anyone ever tell you that Ben

11 Hayhurst had flat out refused to travel to the

12 east coast for an all-hands meeting that the

13 Department of Homeland Security wanted to have

14 with all the reports officers?

15          MS. HEADLEY:  Other than lawyers.

16          THE WITNESS:  I'm sorry.  I didn't hear

17 you.

18          MS. HEADLEY:  Don't talk about what

19 lawyers told you or discussions with lawyers.

20     A.   I probably knew.  It was the same time

21 that we were having issues with Anne traveling.

22          BY MR. GOLUB:

23     Q.   The same time you were having issues with

24 Anne traveling, what does that mean?

25     A.   I believe that there was a week-long

```
1   COMMONWEALTH OF VIRGINIA, to wit:

2            I, Carol A. Lowe, before whom the

3   foregoing depositions were taken, do hereby

4   certify that the within-named witnesses personally

5   appeared before me at the time and place herein

6   set out and after having been duly sworn by me,

7   according to law, was examined by counsel.

8            I further certify that the examination

9   was recorded stenographically by me and this

10  transcript is a true record of the proceedings.

11           I further certify that I am not of

12  counsel to any party, nor an employee of counsel,

13  nor related to any party, nor in any way

14  interested in the outcome of this action.

15           As witness my hand and notarial seal this

16  16 day of June              , 2014.

17

18

19                    CAROL A. LOWE, RPR, Notary Public

20
                      Notary Registration No. 125338
21

22  MY COMMISSION EXPIRES:       12/31/2016
```



# EXHIBIT 9

Thanks Ben, we appreciate the information.

In regards to your follow up email on your job search, the Management team understands we have zero tolerance for retaliation and we will ensure the job search efforts your manager puts forth are consistent with what would be done for any staff person in a potential LOW situation. If you feel that is not happening please reach to Andrew or I and let us know.

Locating your next opportunity is a shared responsibility with a majority of that responsibility on your shoulders as I'm sure you know. If you have not already done so, it would behoove you to proactively seek out future positions by-
- Contacting your Resource Manager
- Working your internal network
- Reviewing job postings and reaching to Recruiters and Hiring Managers
- Getting involved in TFGs, workgroups or forums that might reveal future staffing needs
- Keeping the job search dialogue going with your Career Manager so they remain actively engaged

Thanks again,
*Jenni*

Booz | Allen | Hamilton
Jennifer Wong O'Neil, SPHR
Employment Practices Team
Office: (703) 377-5688
Email: wong_jennifer@bah.com

---

**From:** Hayhurst, Benjamin [USA]
**Sent:** Monday, August 22, 2011 3:35 PM
**To:** Witten, Andrew [USA]; Wong, Jennifer - People Services [USA]
**Subject:** re: Matt Tom issue



Andrew and Jenni,

I thought of something today and it might be relevant to your investigation. I'm not sure, so I am passing it along just in case.

I PCS'd to San Diego in OCT 2008. Matt Tom became my supervisor sometime around SEP 2009.

On 24 OCT 2009, my son was born. I took about 2 weeks of leave and returned to work in early November. The client (DHS) wanted all Reports Officers to travel to a 1 week "off site" in late November. DHS also wanted some of the newer Reports Officers (including me) to attend a 1 week "Reports Officer Basic Course" that they had just started. I told Matt that it would be too hard on my wife to care for a 15-month old (my daughter) and my new-born son and that I needed to stay home. Matt was annoyed with me, but I remained firm and said I could not go. Then Matt called me and said that he went and talked to Jon Wilham (Reports Branch Deputy) and Skip Vandover (Reports Branch Chief). Matt said

DEPOSITION
EXHIBIT
7
*Hayhurst*
PENGAD 800-631-6989

BAH 0471
[BUCKINGHAM]

that their reply to my need to be with my family was "so what" and that he agreed with them. He reiterated that I needed to go on both trips. Shortly after that, I got a call from my direct government supervisor, Senior Reports Officer Luke Rutherford, who asked me if I was going on these 2 trips. I told him that didn't want to go, due to my newborn son, etc. Luke agreed and said that taking care of my family as more important, but he did stress that the Basic Course training was important. I then told Matt that I would be willing to go to the Basic course, but still could not go to the "off site." Matt said that he could not make me go, and even the client could not force me to go, so my decision would stand. But he reiterated that he was not happy with it, the client was not happy, and said something about things like this could effect recompetes, future business, future opportunities for me, etc. He said that I or the firm could get a bad reputation.

I don't have any e-mails related to this as it happened almost 2 years ago.

Hope it helps,

Ben

BAH 0472
[BUCKINGHAM]